IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 22, 2012

## IN RE ISAIAH L. A.

**Appeal from the Chancery Court for Knox County**
**No. 179417-1      John F. Weaver, Chancellor**

_____

**No. E2012-00761-COA-R3-PT-FILED-DECEMBER 20, 2012**

_____

This appeal concerns a termination of parental rights.  The appellees filed a petition for adoption and termination of parental rights with respect to the minor child at issue.  The trial court, upon finding clear and convincing evidence of several grounds on which to base termination and concluding that termination was in the child's best interest, revoked the biological father's parental rights to the child.  The father appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Andrew O. Beamer, Knoxville, Tennessee, for the appellant, Fredrick L. A.[1]

N. David Roberts, Jr., Knoxville, Tennessee, for the appellees, Robert L. A. and Melissa Ann D. A.

Benjamin T. Norris, Strawberry Plains, Tennessee, guardian ad litem for Isaiah L. A.

**OPINION**

**I.  BACKGROUND**

The minor child, Isaiah L. A. ("the Child"), was born in Jefferson County, Kentucky,

---

[1]It is the policy of this court to identify the last names of those involved in termination proceedings by initial.

on June 9, 2007. His mother, Drena G. ("Mother"), was unmarried. No father's name appears on the Child's Kentucky birth certificate, no petition to establish paternity was ever filed concerning the Child, and no order of paternity ever established the Child's legal father. Once the Child was removed to this state, no person registered with the Tennessee Putative Father registry as the father requesting any notices about the Child. The appellant, Fredrick L. A. ("Father"), contends in this action that he is the Child's biological father.[2]

Within 60 days following the Child's birth, and ultimately by virtue of a power of attorney dated November 20, 2008, Mother placed the Child in the physical care and custody of the maternal great-aunt, Frances S. Weems, a resident of Greene County, Tennessee.[3] Following domestic violence incidents between Mother and Father, the Juvenile Court for Greene County removed the Child from Mother's legal custody on October 28, 2009, upon a finding that the Child was subject to an immediate threat of harm. Less than a month later, on November 23, 2009, Ms. Weems died unexpectedly. Two days after the death of Ms. Weems, the Greene County court awarded the appellees, Robert L. A. and Melissa Ann D. A., the maternal great uncle and great aunt of the Child ("the Relatives"),temporary legal custody of the Child, without any objection of Mother or Father.[4] Subsequently, the Relatives sought legal custody of the Child to prevent him from going into state foster care.

In December 2009, Father and Mother met with the Department of Children's Services ("DCS") to develop a permanency plan.[5] The Relatives were given legal custody of the Child at the final hearing on their petition on July 15, 2010. Neither Mother or Father appeared at that hearing.

The Relatives filed the instant lawsuit to adopt the Child and to terminate the parental

---

[2]Father testified that he had signed an acknowledgment of paternity at the hospital for his four other children. However, he was incarcerated at the time the Child was born. As for why he did not acknowledge paternity at a later date, he claimed that he "didn't know how to do that" and "didn't know it needed to be done." It is still unknown whether he is the biological father of the Child.

[3]Father testified that he and Mother had contact with Ms. Weems "almost every day" during their time in Tennessee.

[4]Father stated he believed the arrangement "to be temporary."

[5]Father testified that he completed domestic violence and anger management classes, but did not have the paperwork to prove it. He claimed to not know he was required to take parenting classes. Father acknowledged that he did not complete the DNA testing required by the permanency plan, and that the juvenile judge had suspended his visitation because he had not followed through on proving he was the Child's father.

rights of Mother and Father on December 28, 2010.[6] Father was not incarcerated at the time this action was instituted. He testified he was arrested on March 16, 2011, for the charges on which he was being held at the time process was issued on April 19, 2011.[7] Legal counsel was appointed for Father.[8]

---

[6]An evidentiary hearing on the petition against Mother was held on January 30, 2012. Mother did not appear; her counsel put in an appearance. Mother ultimately sent a letter consenting to the Child's adoption by the Relatives. On March 16, 2012, a final order terminating Mother's parental rights was entered pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. She did not file an appeal.

[7]If Father had been incarcerated prior to the time of the institution of the action, Tennessee Code Annotated section 36-1-102(1)(A)(iv) would have been applicable, requiring review of his actions during the four months preceding incarceration.

[8]Tennessee Code Annotated section 36-1-113(f) provides as follows:

Before terminating the rights of any parent or guardian who is incarcerated or who was incarcerated at the time of an action or proceeding is initiated, it must be affirmatively shown to the court that such incarcerated parent or guardian received actual notice of the following:

(1) The time and place of the hearing to terminate parental rights;

(2) That the hearing will determine whether the rights of the incarcerated parent or guardian should be terminated;

(3) That the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances;

(4) That if the incarcerated parent or guardian wishes to participate in the hearing and contest the allegation, such parent or guardian:

    (A) If indigent, will be provided with a court-appointed attorney to assist the parent or guardian in contesting the allegation; and

    (B) Shall have the right to perpetuate such person's testimony or that of any witness by means of depositions or interrogatories as provided by the Tennessee Rules of Civil Procedure; and

(continued...)

A trial was held on February 28, 2012. Father, at that time, was still incarcerated in Jefferson County, Kentucky, but he fully participated in the entire proceeding by telephone with the assistance of counsel. On March 16, 2012, a final order was entered, pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, terminating the parental rights of Father, upon the basis of clear and convincing evidence establishing the grounds for termination in Tennessee Code Annotated sections (g)(1), (g)(2), (g)(3) and (g)(9), and upon a finding that termination of Father's parental rights was in the best interest of the Child. The trial court provided specifically as follows:

> Based upon the evidence presented at the hearing, the court finds, by clear and convincing evidence, that legal grounds exist to terminate the alleged father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1)-(g)(2)-(g)(3) and (g)(9).
>
> With regard to the legal grounds of abandonment set forth at Tenn. Code Ann. § 36-1-113(g)(1), the court finds from the alleged father's testimony that in the four (4) months preceding the filing of the petition (the period beginning August 28, 2010 to December 28, 2010) that the father (age 35/date of birth February 6, 1977) was gainfully employed as a saw operator and lead man, supervising three other employees, at Ohio Valley Aluminum in Shelbyville, Kentucky. The alleged father was employed there full time from approximately February, 2010 until laid off in February, 2011, making $13.36-$16.36 per hour while employed there. The alleged father testified that he did not pay any child support for the benefit of the minor child during that year of employment nor pay for a DNA test to establish as the legal father of the child due to having other financial obligations related to his girlfriend, [Mother], and another child, Jeremiah A[.], born September 20, 2010, and his three (3) other children, Deonte A[.], age 16 (Date of birth: 2/27/1996); Fredrick James A[.], age 11 (date of birth: 9/12/2000); Christopher Joseph Thomas A[.], age 9 (date of birth: 3/2/2002); by a previous relationship with Lashonda Yocum. The alleged father has never been married and all of his children have been born out of wedlock. The court finds that the alleged father's failure to pay child support for the minor child was willful in that the alleged father was gainfully

---

[8](...continued)
> (5) If, by means of a signed waiver, the court determines that the incarcerated parent or guardian has voluntarily waived the right to participate in the hearing and contest the allegation, or if such parent or guardian takes no action after receiving the notice of such rights, the court may proceed with such action without the parent's or guardian's participation.

employed full time, and did not provide for this child while allegedly providing for his other four (4) children and this child's mother.

From November 25, 2009 until suspended by the Court on June 15, 2010, the alleged father was allowed supervised visitation on each Sunday from 10:00 a.m. until noon. During this period of time the alleged father could have had twenty-nine (29) visits. The alleged father testified that he visited five (5) times during that period, and the petitioners testified it was four (4) times. Thereafter, the alleged father could have had his visitation re-instated during the four months preceding the filing of the petition, if he had submitted to the DNA testing. The alleged father testified while living in Greene County the cost would have been around $200.00 but that he could not afford it and after returning to Kentucky it was around $500.00, but that his resources while working were committed otherwise. Due to his refusal to complete the DNA testing as ordered by the Juvenile Court and as agreed to by the alleged father in the permanency plan, the Court finds that the failure to visit with the child was willful. Furthermore, the alleged father failed to maintain contact with the petitioners and the child concerning his whereabouts after leaving Tennessee in January, 2010.

With regard to the legal grounds of substantial noncompliance with the permanency plan set forth at Tenn. Code Ann. § 36-1-113(g)(2), the court finds from the alleged father's testimony and the exhibits that the alleged father participated in the permanency plan process and signed the permanency plan on December 7, 2009. In the plan the alleged father agreed to submit to DNA testing to prove his parentage of the child, to take parenting classes, anger management classes, domestic violence classes, participate in an alcohol and drug assessment and a parenting assessment, and present proof of completion of such classes and assessments, obtain and maintain stable housing for a period of at least four months, to obtain and maintain stable and legal employment for a period of at least four months, attend marriage counseling and provide proof of compliance. The alleged father testified that he never completed the DNA testing due to his alleged lack of resources. He testified that he completed the anger management and domestic violence classes but that the certificates were in the possession of his Greene County attorney. He testified that he was not aware that he needed to take parenting classes or a drug and alcohol assessment. Following the completion of the permanency plan in December, 2009, the alleged father along with the mother, moved back to Kentucky in January, 2010, after discovering that Drena G[.] was pregnant again with another child and they did not want that child taken

from them. The respondents never established stable housing and employment in Greene County, and did not otherwise demonstrate compliance with the permanency plan after relocating to Kentucky in January, 2010. The court finds by clear and convincing evidence that there was substantial noncompliance with the December 7, 2009 statement of responsibilities as contained in the permanency plan developed by the Tennessee Dept. of Children's Services.

With regard to the legal grounds set forth at Tenn. Code Ann. § 36-1-113(g)(3), the court finds by clear and convincing evidence, that the child was removed from the home of the alleged father and mother by order of the Greene County Juvenile Court for a period in excess of six (6) months, upon a finding of dependency and neglect, on June 15, 2010, and that the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevents the child's safe return to the care of the parents, still persist; there is [little] likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parents in the near future; and the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. The child has never lived with the alleged father. The alleged father testified that he is the legal father of all of his other four (4) children, except for this child. The alleged father was incarcerated at the time of the child's birth, and at trial was again incarcerated and awaiting trial on criminal charges. While the alleged father was allowed supervised visitation by the Juvenile Court with the child, he completed only a few visits with the child, and shortly after completion of the permanency plan the alleged father and mother left Tennessee and relocated to Kentucky to have another child. The alleged father testified that they left Tennessee because of their fears that someone might attempt to remove this child from them also once it was born. Although gainfully employed in Kentucky after relocating there, the alleged father failed to provide for the child financially. Once the child was placed by the mother with Frances Weems shortly after his birth, the mother never filed any proceeding to regain custody of the child, and the alleged father never filed any legal proceedings for custody of the child.

With regard to the legal grounds set forth at Tenn. Code Ann. § 36-1-113(g)(9), which apply to putative or alleged father's who have not legally legitimated a child, the court finds, by clear and convincing evidence, that:

(g)(9)(i) The alleged father has made no attempt to repay the State of Kentucky for any of the birthing costs associated with the birth of the child. The alleged father insists that the State of Kentucky has not sought any repayment from him.

(g)(9)(ii) The alleged father has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accord[ance] with the Tennessee child support guidelines, despite testifying that, when employed full time during 2010, that he supported his other four (4) children with his resources.

(g)(9)(iii) The alleged father has failed to seek reasonable visitation with the child, and if visitation has been granted, has engaged in only token visitation. When granted supervised visitation by the Greene County Juvenile Court the alleged father, at best, attempted only 5 of 29 allowable visits, and after failing to take a DNA test could have had his visitation reinstated by complying with DNA testing. The father's visitation has been token at best.

(g)(9)(iv) The alleged father has failed to manifest an ability and willingness to assume legal and physical custody of the child. The alleged father . . . never followed through to establish any legal rights to the child by proving his parentage (even though he testified that he established legal rights to his other four children); never filed any legal proceedings for either physical or legal custody of the child; and left the state of Tennessee for Kentucky without completing the permanency plan he signed.

(g)(9)(v) Placing custody of the child in the alleged father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The alleged father has a history of arrests and domestic violence charges perpetrated against the child's mother.[9] The alleged

---

[9]Father has a lengthy criminal history. Father was arrested in 2002 and received a seven-year sentence. On May 17, 2007, approximately three weeks prior to the Child's birth, Father was re-arrested for

(continued...)

-7-

father is currently in jail facing new legal charges. The alleged father has not shown compliance to the court with domestic violence classes or anger management classes other than his unsubstantiated statements that he completed those classes.

As shown by clear and convincing evidence, termination of the alleged father's parental rights is in the best interest of the child. Upon consideration of the factors set forth at Tenn. Code Ann. § 36-1-113(i) the court finds that the parents have not made such an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of either the mother or the alleged father. The parents have failed to effect a lasting adjustment after reasonable efforts by available social services for such duration of time that lasting adjustment does not appear reasonably possible. The court finds that the parents have not maintained regular visitation or contact with the child and the court finds that no meaningful relationship has otherwise been established between the parents and the child. The alleged father admitted in testimony that the child would be likely unable to identify or recognize him due to the few contacts between him and the child. The court finds that a change of caretakers and physical environment is likely to be detrimental to the child since now, at four (4) years of age, the child has resided in the petitioners' home since November, 2009, that the child refers to the petitioners as his mother and father and to their other two children as his brothers. The petitioners testified that there is significant bond between the child and the members of the prospective adoptive family. The alleged father's continued involvement in activities leading to arrests and incarceration render him unable to care for the child

---

[9](...continued)

a parole violation in Kentucky; at the time of the Child's birth, Father remained in jail. Following his release from confinement, Father and Mother again lived together. Father was arrested for domestic violence against Mother in Kentucky. Subsequently, Father moved to Greeneville, Tennessee, with Mother. He was arrested twice on domestic violence charges in Greene County against Mother. Subsequent to his arrest in Greeneville, on January 17, 2010, for domestic violence against Mother, Father served six months in jail. Thereafter Father and Mother both left Tennessee. Despite only living in Greeneville for six months, Father and Mother moved back to Kentucky in February, 2010, leaving the Child behind with the Relatives. In Kentucky, Father was again arrested for numerous new criminal charges.

on a consistent basis as needed by a child of a young age. The court finds that the child has not been regularly and consistently supported by the parents but has been regularly and fully supported, including health insurance coverage, nurtured and completely cared for physically, emotionally, mentally and spiritually by the prospective adoptive parents. The child is in a loving, stable, safe, and permanent home with the prospective adoptive parents where he is doing well. The child is related to the petitioners and the petition[er]s prevented the child from being placed into state foster care by acting quickly to seek and maintain custody of him upon the unexpected death of Frances Weems, his prior custodian.

(Numbering omitted.). The trial court granted full legal guardianship of the Child to the Relatives. Father filed a timely notice of appeal to this court.

## II. ISSUE

The issue raised by Father is whether termination of his parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In*

*re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C. W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn.2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

# IV. DISCUSSION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

**36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

* * *

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected

-11-

to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(a) - (g)(3)(A)-(C) (Supp. 2012)[10]

Another applicable statutory provision, Tennessee Code Annotated section 36-1-113(g)(9)(A), provides as follows:

The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117)(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the

_____

[10]Recent amendments have not modified provisions applicable in this case.

child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)
. . . .

Tenn. Code Ann. § 36-1-113(g)(9)(A) (Supp. 2012).

The pertinent statutory definition of "abandonment" is addressed in Tennessee Code Annotated section 36-1-102:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

* * *

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means.

-13-

(C)  For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

(E)  For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

* * *

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition.  Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made.  Decisions of any court to the contrary are hereby legislatively overruled; and

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children . . . .

Tenn. Code Ann. § 36-1-102(1)(A)-(H) (2010).


### a.  Abandonment

The relevant time frame to determine "abandonment" is the four months preceding the filing of the petition.  In the instant case, the petition for adoption and termination of parental rights was filed on December 28, 2010.  Accordingly, the four-month time period preceding the filing of the petition would have been from August 28, 2010, until December 27, 2010.

In regard to failure to support the Child, in the four months preceding the filing of the petition, Father was gainfully employed as a saw operator and lead man, supervising three other employees, at Ohio Valley Aluminum in Shelbyville, Kentucky. Father testified that he was employed there full time from approximately February 2010, until laid off in February 2011, making $13.36 -$16.36 per hour. Father further admitted that he did not pay any child support for the benefit of the Child during that period of employment or pay for a DNA test to establish himself as the legal father of the Child due to having other financial obligations related to Mother and his other children.[11] We conclude that there was clear and convincing evidence to establish that Father willfully failed to remit support for the Child.

With regard to the failure to visit with the Child, in the relevant period, Mother and Father were living in Kentucky after leaving Tennessee in January 2010. Father was in agreement with the placement of the Child with the Relatives.[12] Even when Father had been granted visitation with the Child, the proof revealed that Father exercised little contact with the Child. According to the Relatives, their records showed that Father visited the Child four times.[13] Father argues that he could not visit because the juvenile court suspended his visitation pending the completion of DNA testing to determine his parentage. The record supports the conclusion that Father's own actions dictated the prevention of visitation. If he had submitted to the DNA testing and the results had established him as the father of the Child, Father's visitation would have been reinstated. Accordingly, the record reveals clear and convincing evidence to establish that Father willfully failed to visit the Child.

This court has consistently held that the term willfulness as it applies to a party's failure to support or failure to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings

---

[11]On cross examination by his counsel, Father described the "support" he had provided to the Child.

Q. Do you know how much money you've sent?

A. I know I have sent probably, I don't know, maybe – I sent what I could afford, so I was taking care of three children, so it might be $50 here, $40 here. He needed shoes one time, I sent money to Ms. Franc[e]s for that. Other than that, there hasn't been a whole lot, no.

[12]Regarding to the Child's placement with the Relatives, Father testified that he did not want the Child removed from their home, but simply wanted to have contact with him. Concerning his relationship with the Child, Father candidly admitted that "I would be almost a stranger to him." Father stated his main opposition to the adoption was the changing of the Child's name: "I'm opposed to the adoption as far as changing the name." "Again, like I said, I don't oppose him staying with them and I know he would be happy there."

[13]Father claimed that he had tried to contact the Child, but had been rebuked by the Relatives.

"does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

Based upon the factual findings, the trial court properly found that the Relatives met their burden of proof with regard to abandonment under Tennessee Code Annotated section 36-1-113(g)(1).

### b. Permanency Plan

Father did not raise any challenges to the trial court's finding regarding Tennessee Code Annotated section 36-1-113(g)(2) – non compliance with the permanency plan. The proof established that the juvenile court approved a non-custodial permanency plan, which Father signed on December 7, 2009. Subsequently, Father moved back to Kentucky the following month. He did not attend the next court hearing in June 2010, at which time the Child was found dependent and neglected by clear and convincing evidence and the Child's placement was continued with the Relatives. No evidence was presented to the juvenile court that Father had completed any of the goals and requirements in the permanency plan. At the time of trial, Father again failed to establish that he had complied with the permanency plan. Based upon the record, the trial court properly determined that the Relatives met their burden of proof under (g)(2).

### c. Persistent Conditions

Father also did not raise any issues regarding the court's finding pursuant to Tennessee Code Annotated section 36-1-113(g)(3) – persistent conditions.

At a hearing after the development of the permanency plan, the juvenile court found that the Child was dependent and neglected. The court determined that Father had not legitimated the Child. At a later juvenile court hearing in June 2010, Father did not attend and provided no evidence of compliance with the permanency plan. Father had not

supported the Child or visited with the Child since returning to Kentucky. At the time of trial, Father was incarcerated, as he had been at the Child's birth. Father therefore was unable to work to support the Child. We conclude that there was clear and convincing evidence to establish that the conditions that led to removal and other conditions that prevent the Child's safe return persist, that there is little likelihood the conditions will be remedied at an early date, and that the continuation of Father's relationship with the Child will greatly diminish the Child's chances of early integration into a safe, stable, and permanent home. Accordingly, the record supports the conclusion of the trial court regarding this ground.

### d. "Putative Father"

Tennessee Code Annotated section 36-1-113(g)(9)(A) relates to terminating the parental rights of putative fathers. Sufficient proof of any single ground is sufficient to terminate parental rights under (g)(9)(A). The record clearly reveals that Father has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the Child in accordance with Father's financial means promptly upon notice. Father also has failed, without good cause or excuse, to make reasonable and consistent support payments for the Child. Father worked and earned income during the four months preceding the filing of the petition, and he allegedly provided financial support for Mother and his four other children. However, he did not use any of his income or resources to pay for the DNA test or to support the Child. Additionally, Father has failed to seek reasonable visitation with the Child, and of the visitation that was granted to him, he made only token if any visits. When visitation was stopped due to Father's refusal to take a DNA test, Father never took the necessary test to resume visitation with the Child.

Further, Father clearly has failed to manifest any ability and willingness to assume legal and physical custody of the Child. He did not take steps to legitimate the Child through legal proceedings or to demonstrate compliance with the court-approved permanency plan. He never filed a petition for custody of the Child. His incarceration now renders him unable to take the Child. Further, placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. The Relatives have met their burden of proof under (g)(9)(A).

### e. Best Interest

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Father's parental rights, we must consider whether termination

-17-

of Father's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36–1–113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

As found by the trial court, Father had not made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the Child's best interest to be in Father's home. Father had failed to effect a lasting adjustment after reasonable efforts by available social services for such duration of time that lasting adjustment does not appear reasonably possible. Father had not maintained regular visitation or contact with the Child and no meaningful relationship had otherwise been established between them. A change of caretakers and physical environment would be detrimental to the Child, who thinks of the Relatives as his parents. We conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Fredrick L. A.

_____
JOHN W. McCLARTY, JUDGE

-19-